## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DWIGHT LOUERS, et al.** | * | |
| | * | |
| **v.** | * | **Civil No. JKS-10-2292** |
| | * | |
| **SHANITA R. LACY, et al.** | * | |
| | * | |

## MEMORANDUM OPINION

Presently pending and ready for resolution is the motion for summary judgment (ECF No. 119) filed by two of the seven defendants in this case, Transcontinental Title Company (Transcontinental) and First American Title Insurance Company (First American) (referred to collectively as Transcontinental).[1]  No hearing is deemed necessary.  For reasons outlined below, the motion will be granted as to Counts I and IV and denied as to Counts II and III.

## I.   Standard of Review.

Rule 56 of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).  "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Maracich v. Spears*, 675 F.3d 281, 291 (4th Cir. 2012) (citation omitted).  "The moving party is 'entitled to judgment as a matter of law' when the nonmoving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial." *Id.*  "In ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Id.*

---

[1] First American purchased Transcontinental in 2006, just prior to the transactions involving Plaintiffs.  At all times relevant to this case, the employees of Transcontinental were also employees of First American.  (Summ. J. Mot. 2); (Summ. J. Opp'n 1 n.1).

## II.    Background.

The Louers are former owners of real property located at 7505 Marion Street, District Heights, Maryland.  In 2007, they fell behind on the mortgage payments, and were put into contact with Defendants Shanita and Clarence Lacy and Clean Slate Financial Services, LLC (Clean Slate).  The Louers allege that the Lacys and Clean Slate fraudulently represented to them that they could avoid foreclosure by assigning an investor, Defendant James Arnold Bennett, to purchase their property for a period of one year.  The Louers also allege that they were told they could remain in their home during this one-year time period while the mortgage, rent and taxes were paid, after which their credit would be sufficiently repaired to allow them to repurchase their home.  Bennett, however, was a "straw purchaser" who did not provide any purchase money for the Louers' home.  When the Lacys and Clean Slate failed to make the promised mortgage payments, the home was foreclosed.  The Louers allege that they were ultimately deprived of the title to and significant equity in their property, in the amount of approximately $200,000.

The Louers allege that the scheme was facilitated by the knowing cooperation of First American's predecessor Transcontinental, which acted as the title insurer and settlement company for the Louers' transaction with Bennett.

The Amended Complaint (ECF No. 47) sets out five counts:

- Count I—Fraud-Misrepresentation and Conspiracy to Commit Fraud;
- Count II—Violation of Maryland's Protection of Home in Foreclosure Act of 2005 (PHIFA);
- Count III—Unjust Enrichment;
- Count IV—Negligence; and
- Count V—Breach of Contract.

Count V (Breach of Contract) is not a subject of this motion because it does not name Transcontinental or First American.

2

## III. __Discussion.__

### A. *Count I—Fraud-Misrepresentation and Conspiracy to Commit Fraud*

#### a. Fraud-Misrepresentation

The thrust of Plaintiffs' fraud claim is that Transcontinental was aware of the foreclosure rescue scheme that was put in place by Ms. Lacy (through her company, Clean Slate) and affirmatively misrepresented facts for the purpose of furthering the scheme. Transcontinental contends that the Plaintiffs have not presented sufficient admissible evidence to satisfy the elements of a fraud claim.

In order to establish fraud in Maryland,[2] a plaintiff must show: "(1) that the one perpetrating the fraud made a false representation to the victim; (2) that its falsity was either known to the perpetrator or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the victim; (4) that the victim relied on the misrepresentation and had the right to rely on it; and (5) that the victim suffered compensable injury resulting from the misrepresentation." *Thomas v. Nadel*, ___ Md. ___, No. 106, 2012 Md. LEXIS 379, at *16 n.18 (June 25, 2012) (citation omitted).

Plaintiffs argue that "Transcontinental knowingly made [at least seven] direct misrepresentations to [them] upon which they relied to their detriment." (Summ. J. Opp'n 25). Plaintiffs allege that Transcontinental, through its agents and/or employees,

- prepared a HUD-1 form which falsely indicated that James Bennett was the purchaser of the Plaintiffs' home, when in fact the real purchasers were Shanita Lacy and Clean Slate;
- prepared a HUD-1 form which falsely indicated that Bennett brought $64,263.56 to the closing even though he paid nothing;
- ignored the lender's closing instructions;
- knew that the Louers would not receive $160,110.98 from the proceeds;[3]

---

[2] Maryland law governs this diversity action.

[3] This allegation is unfounded. Mr. Louers admitted that he received a disbursement from Transcontinental in the amount of $160,110.98 to his credit union account. (Louers Dep. 75). That Mr. Louers proceeded to write a $130,110.98 check to Ms. Lacy does not change the fact that he received the original payment.

- filed a Deed indicating that the transfer of the property was a fee simple transaction when in fact it was not a sale at all;
- knew that the "Fraud Alert" safeguards generated by the lender had not been followed;
- knew that the Clean Slate Benefit Analysis and Payoff Demand indicated that the buyers' funds would come from the sellers' proceeds, that Clean Slate would be getting a "consultant fee" of $56,264.46 and that over $130,000 of the sellers' proceeds would go to Clean Slate;[4]
- knew that the Payoff Demand falsely represented that failure to make the agreed payment to Clean Slate would subject the Louers to foreclosure, when in fact the Louers had a statutory right to rescind the contract within 3 days.

(Summ. J. Opp'n at 26-29).

Transcontinental, in contrast, contends that "[t]here is no evidence that Transcontinental employees participated in the preparation of the foreclosure rescue program documents." (Summ. J. Mot. 16).  Transcontinental acknowledges that its employees created the HUD-1 document showing the receipt of a $1,000 earnest money payment from James Bennett, but contends that "[t]here is no evidence that the Plaintiffs relied upon the representation that those funds were received in deciding to go through with the transaction in question."  *Id.*

Plaintiffs point to evidence and deposition testimony which create a genuine issue as to whether Transcontinental employees knew about the foreclosure rescue scheme.  Ms. Lacy testified that Transcontinental provided the settlement services for all of her transactions, including her foreclosure rescue transactions in Maryland.  (S. Lacy Dep. 63-64).[5]  Mai Tani Waye, a Transcontinental regional manager, knew that Ms. Lacy was working with a company called Clean Slate and that Clean Slate was in the business of helping people save their

---

[4] It is not clear whether a Transcontinental employee ever saw these documents.  They are signed only by Mr. and Mrs. Louers and indicate that they were drafted by Ms. Lacy.  Plaintiffs claim that the documents were presented to them by John Scollan, the settlement agent hired by Transcontinental to perform the closing.

[5] Ms. Lacy further stated that Transcontinental "knew how the process worked" and confirmed that "some of the employees from Transcontinental Title actually referred homeowners to [her] to enter the foreclosure rescue program."  (S. Lacy Dep. 86-89).  Transcontinental complains that this testimony is inadmissible opinion evidence and was evoked as a result of leading questions by plaintiffs' counsel.  Ms. Lacy's opinion or belief as to what Transcontinental employees knew lacks the basis of knowledge required to render it admissible, although her testimony that Transcontinental employees referred homeowners to her does not suffer from that deficiency.  In any event, this testimony has not been considered in resolving any of the matters discussed in this opinion.

properties from foreclosure.  (Waye Dep. 77).  Ms. Waye also knew that Ms. Lacy's program

was not an ordinary arm's length sale between a buyer and a seller, that Clean Slate was

receiving money from these transactions, and that Clean Slate and Ms. Lacy "were supposed to

be making mortgage payments [on the houses.]" (Waye Dep. 124-25).  When Ms. Waye realized

that Clean Slate was receiving money from these transactions, she sought and received approval

from the Virginia regional manager, Ms. Sandra Kazebeer.  (Waye Dep. 131-33).  Although far

from conclusive, Ms. Waye's testimony would support a finding that she knew, or should have

known, that Clean Slate used a straw purchaser for the Louers' transaction.[6]

Yana Turner, another Transcontinental employee, testified that she knew Shanita Lacy

well, knew that Lacy and Clean Slate were in the foreclosure rescue business, and knew that the

Clean Slate transactions involved investors who would purchase the property and possess title to

the property until the homeowner could buy it back.  She also testified that the Clean Slate

program was discussed in Transcontinental's Virginia Beach office.  (Turner Dep. 22-30).

Ms. Kazebeer, in contrast to Ms. Waye and Ms. Turner, testified that Transcontinental

employees could not go forward with a closing if they were aware that the buyer was a straw

purchaser or that a third party was involved.  (Kazebeer Dep. 87-91).  She explained that

"anything that could impede the lender's ability to be in first lien position or collect their money,

then you have to question it. . . . if you knew that a straw purchaser [was involved] . . . you

would have had an issue." (Kazebeer Dep. 92).

Transcontinental hired Mr. John Scollan to perform the settlement services for the

Louers/Bennett transaction.  (Scollan Dep. 54).  Mr. Scollan acknowledged that the "buyer

information form" he presented at closing indicated that the buyer intended the property to be a

---

[6] It is undisputed that James Bennett was a straw purchaser.  He did not provide any purchase funds, and testified that "I knew that I was taking ownership of that property for one year and then, within one year, the person is supposed to rebuild their credit and repurchase their property." (Bennett Dep. 28).  Mr. Bennett recalled his conversation with the settlement agent at the closing: "I got to talking about me getting this $5,000 for doing [the deal]" and "we were talking about the whole format of the rescue program." (Bennett Dep. 107).  Mr. Bennett testified that the settlement agent thought the rescue program "was a pretty cool thing."  *Id.*

"rental/secondary property." (Scollan Dep. 65-66).  Mr. Scollan also acknowledged that he had

the parties sign the Deed of Trust at closing, which indicated that the property was to be the

buyer's primary residence.  *Id.* at 67.  Mr. Scollan acknowledged this discrepancy after the fact,

and realized that this constituted fraud, but he expected Transcontinental to make this known to

the lender.  *Id.* at 67-69.  Mr. Scollan sent the package of documents to Transcontinental after the

closing ended.  *Id.* at 107.

Under Maryland law, a scheme in which title is transferred to prevent foreclosure while

permitting the seller to continue to occupy the property in exchange for monthly "rent" payments

is a mortgage, not a sale.  *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 482

(D. Md. 2009) (citing *Thomas v. Klemm*, 185 Md. 136, 140-41, 43 (1945)).   Plaintiffs have

evidence that Transcontinental employees knew that this transaction was such a scheme, but

nevertheless generated and filed a Deed that falsely represented it as a sale.  Plaintiffs contend

that Transcontinental turned a blind eye to the rescue scheme in order to keep Ms. Lacy as a

regular customer.[7]

Transcontinental claims that it cannot be held vicariously liable for the actions of its

employees.  An employer may be held vicariously liable for the tortious conduct of an employee

as long as the employee is acting within the scope of the employment relationship.  *Silvera v.

Home Depot U.S.A., Inc.*, 189 F. Supp. 2d 304, 308 (D. Md. 2002) (citation omitted).  The

following factors are considered in determining the scope of employment:

> whether or not the act is one commonly done by such servants; (b) the time,
> place and purpose of the act; (c) the previous relations between the master and
> the servant; (d) the extent to which the business of the master is apportioned
> between different servants; (e) whether the act is outside the enterprise of the
> master or, if within the enterprise, has not been entrusted to any servant; (f)
> whether or not the master has reason to expect that such an act will be done; (g)
> the similarity in quality of the act done to the act authorized; (h) whether or not

---

[7]  Plaintiffs also claim to have evidence that Transcontinental altered documents in other foreclosure rescue transactions to conceal Clean Slate's involvement, and that Transcontinental employees served as straw purchasers on occasion, but they do not contend that this occurred in their own transaction.

the instrumentality by which the harm is done has been furnished by the master
to the servant; (i) the extent of departure from the normal method of
accomplishing an authorized result, and (j) whether or not the act is seriously
criminal.

*Sawyer v. Humphries*, 322 Md. 247, 256 (1991) (citations omitted).  Transcontinental contends that "[a]s soon as any Transcontinental employee went beyond their [sic] normal settlement duties and falsified documents, made false representations to parties, or committed any other intentional act not required or permitted in the context of settlement, said employee went beyond the scope of their [sic] employment." (Summ. J. Mot. 27).

Transcontinental's argument on scope of employment fails as to the preparation and filing of documents.  Transcontinental employees were performing their usual duties when they executed the HUD-1 and the lender's "Instructions to Closing Agent: Fraud Alert."  Regardless of whether Transcontinental directed its employees to falsify these documents, preparing them was within the scope of their employment and Transcontinental is responsible for their actions.

Nevertheless, Plaintiffs' fraud claim cannot survive summary judgment.  First, there is no evidence that any Transcontinental employee falsified documents for the purpose of defrauding the Louers, or had actual or constructive knowledge of Lacy's intent to steal the Louers' equity in their home.  In addition, the evidence undisputably indicates that Plaintiffs chose to pursue this rescue program because of the representation that the program could save their home from foreclosure, a representation made by Ms. Lacy, not by Transcontinental.  Any subsequent misrepresentations made by Transcontinental in connection with the closing played no part in Plaintiffs' decision to pursue the Clean Slate program.

Moreover, even if Plaintiffs, as they claim, relied on Transcontinental in going through with the closing, such reliance would not be reasonable.

A misrepresentation is generally immaterial if the party to whom it is
made reasonably could have ascertained the true facts. And, ordinarily, a person
who executes a document is legally obligated to read it before executing it.

* * * * *

> The fourth element of a fraud claim requires proof that the plaintiff relied on the misrepresentation and had the right to rely on it.  In determining if reliance is reasonable, a court is required to view the act in its setting, which will include the implications and promptings of usage and fair dealing.  A strict "but for" analysis is not the exclusive test for the "reliance element" in a fraud claim, however.  As the Court [of Appeals has] recognized . . . the misrepresentation need not have been the only motivation for the plaintiff's actions; it is sufficient that the misrepresentation substantially induced the plaintiff to act.

*Sass v. Andrew*, 152 Md. App. 406, 440-41 (2003) (citations and quotation marks omitted).

Mr. Louers' testimony clarifies either that he could have ascertained the true facts, or that he was already fully aware of them.  When asked how Ms. Lacy described the rescue program to him, Mr. Louers stated:  "They will find an investor to hold our property for a year's time, and once that year's time is up, we will be able to use our good credit standing to repurchase the home from the investor."  (Mr. Louers Dep. 59).  Mr. Louers asked no questions about the papers because "[w]e trusted in what the process was."  *Id.* at 69.  He sent a check to Clean Slate because "[t]hat would cover us for the year's time . . . that it would take for us to get the house back from the investor.  And that would cover the taxes, [and] the monthly [payments] – all that kind of stuff that goes along with their program that helped us save . . . our home."  *Id.* at 82-83.

Mr. and Mrs. Louers only briefly looked over the documents at the closing and did not read them.  *Id.* at 71-73.  Although Mr. Louers claims that he did not believe that he was selling his home to Mr. Bennett, Louers Dep. at 67-69, he signed a deed transferring the property to Mr. Bennett.  *Id.* at 69.  Following the sale of the property, Mr. Louers received a disbursement from Transcontinental to his credit union account, and then wrote a $130,110.98 check to Ms. Lacy from the credit union account.  *Id.* at 75, 82.

Even drawing all reasonable inferences in favor of Plaintiffs, they cannot show that any misrepresentation by Transcontinental substantially induced them to participate in the Clean Slate program.  As *Sass*, 152 Md. App. at 441, makes clear, the misrepresentation must

"substantially induce[] the plaintiff to act," and "is generally immaterial if the party to whom it is made reasonably could have ascertained the true facts." Plaintiffs came to the closing having already decided to participate in the Clean Slate program. If it meant staying in their home, they were—perhaps understandably, but not reasonably—willing to sign anything. No factfinder could find that Plaintiffs reasonably relied on documents which they did not read.

In sum, Plaintiffs cannot show that Transcontinental acted for the purpose of helping the Lacys defraud them, cannot show that any reliance on Transcontinental's actions was reasonable, and cannot show that Transcontinental made a *material* misrepresentation.

> b.  Conspiracy to Commit Fraud

Plaintiffs argue that the evidence demonstrates a pattern of conduct between Transcontinental and Shanita Lacy from which an agreement can be inferred. Transcontinental argues that "[e]vidence of a conspiracy is only sufficient where the Court is convinced 'that the parties were acting together understandingly in order to accomplish the fraudulent scheme.'" *Hoffman v. Stamper*, 385 Md. 1, 17 (2005) (quoting *Western Maryland Dairy, Inc. v. Chenowith*, 180 Md. 236, 243 (1942)).

Under Maryland law, a civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Id.* at 24 (citation and quotation marks omitted). "[A] conspiracy may be proved by circumstantial evidence, 'for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone.'" *Id.* at 25 (quoting *Chenowith,* 180 Md. at 243). "It is sufficient if the proven facts and circumstances, pieced together and considered as a whole, convince the court that the parties were acting together understandingly in order to accomplish the fraudulent scheme." *Id.* (citation omitted). The *Hoffman* Court upheld a jury's determination that the defendants acted in concert to

accomplish a scheme involving fraudulent home appraisals, reasoning that the evidence showed

more than just "some isolated inaccuracies in individual appraisals or with honest differences of

opinion between Hoffman and the plaintiffs' expert over some fine points of appraisal practice."

*Id.* at 26.  The court continued:

> Some of these departures, viewed in isolation, might be regarded as simple
> negligence, as Hoffman argues, but "pieced together and considered as a whole,"
> they suffice to show that Hoffman was aware of what Beeman [the person who
> sold the property at an inflated value] was doing, that he understood that
> Beeman's scheme could not work unless he produced appraisals at or above the
> inflated contract price, and that he knowingly participated in that scheme by
> providing those appraisals. . . . Hoffman made it all work.

*Id.* at 27-28.

Here, the evidence of an agreement or pattern of activity between Ms. Lacy and

Transcontinental falls short of what was presented in *Hoffman*, where there was a "consistent

pattern" and "Hoffman derived 99% of his income from [inaccurate] appraisals done for" his

partner.  *Id.* at 27.  To be sure, Plaintiffs do have evidence that Transcontinental provided

settlement services for nineteen of Ms. Lacy's "rescue foreclosures," and that some

Transcontinental employees knew enough about the rescue scheme to provide a colorable

argument that they were acting together in order to accomplish it.  However, there is no evidence

that any Transcontinental employee knew of Ms. Lacy's fraudulent—indeed criminal[8]—intent

with regard to this scheme.

In addition, Transcontinental would not be vicariously liable for any fraudulent scheme.

To be within the scope of employment, conduct must be of the kind the servant is employed to

perform.  *East Coast Freight Lines v. Mayor of Baltimore*, 190 Md. 256, 284-85 (1948); *see also*

*Sawyer v. Humphries*, 322 Md. 247, 255 (1991).  Applying the previously discussed *Sawyer*

factors, participation in a fraud scheme is a criminal departure from the normal duties involved in

---

[8] Ms. Lacy has pled guilty to federal criminal charges arising from her involvement in this foreclosure rescue scheme.  (ECF No. 104-4).

accomplishing a real estate settlement, and there is no evidence that Transcontinental had any basis to suspect that its employees would participate in a fraud. The act of giving its employees the authority to prepare closing documents makes Transcontinental responsible for the content of those documents, but it does not make Transcontinental a participant in a fraud scheme. *See, e.g., Antonio v. Security Services of America, LLC,* 701 F. Supp. 2d 749, 768-69 (D. Md. 2010) (noting that personal acts by employees amounting to an intentional tort, even if performed while on authorized duty, are outside the scope of employment, citing *Sawyer,* 322 Md. at 256-57).

In addition, as previously noted, there is no evidence that any Transcontinental employee was aware of the fraudulent nature of Ms. Lacy's scheme or "that the parties were acting together understandingly in order to accomplish the fraudulent scheme." *Hoffman*, 385 Md. at 17. Transcontinental is entitled to summary judgment as to both aspects of Plaintiffs' fraud claim.

### B.  Count II—PHIFA Violation

The Maryland Legislature enacted PHIFA, effective May 1, 2005, "[i]n response to what it viewed as growing mortgage foreclosure abuses." *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 503 (D. Md. 2007). The Act is codified in Subtitle 3 of Title 7 of the Real Property Article. MD. CODE ANN. REAL PROP. §§ 7-301 *et seq.* (1974, 2010 Repl. Vol.).[9]

PHIFA applies to foreclosure consultants, foreclosure consulting services and foreclosure purchasers. RP §§ 7-301(b), (c) and (e). An entity which provides settlement services for a closing which it knows is a foreclosure reconveyance is a "foreclosure consultant" under PHIFA. *Massey v. Lewis*, 2009 U.S. Dist. LEXIS 129908, at *3 (D. Md. Feb. 24, 2009). The evidence that Transcontinental's employees knew that Plaintiffs' transaction was a foreclosure reconveyance, if accepted, would support a finding that Transcontinental was a foreclosure

---

[9] PHIFA was repealed in 2008, reenacted by Chapters 5 and 6 of the Maryland Laws of 2008, and recodified in Sections 7-301 to 7-325 of the Real Property Article, with an effective date of April 3, 2008. The relevant events in this dispute took place prior to the 2008 revisions, and all references to PHIFA are to the 2005 version.

consultant under the statute.  However, Transcontinental asserts that its activities fell within

PHIFA's exemption for "[a] title insurer authorized to conduct business in the State, while

performing title insurance and settlement services."  RP § 7-302(a)(5).

It is undisputed that Transcontinental acted as a title insurer and provided settlement

services within the meaning of the statutory exemption.  However, this exemption is lost when

the title insurer performs a service that goes beyond normal settlement services.  For example, in

*Massey,* the defendant settlement agent inexplicably withheld $1,365.50 from the amount listed

on the HUD-1 form as owed to the seller.  The court ruled as a matter of law that this service

went beyond the scope of the agent's license.  While this alone was enough to create liability

under PHIFA, the court also found liability based on the facts that the agent induced the plaintiff

to enter the contract and recorded both the deed the plaintiff had rescinded as well as its

accompanying mortgages.  In *Proctor,* 645 F. Supp. 2d at 488-89, a PHIFA claim was stated

against a settlement agent who knew the property was in foreclosure, knew of the rescue scheme,

falsified HUD-1 documents, and did not give the plaintiffs notice of their right to rescind the

transaction.

Here, there is evidence that Transcontinental knew that the Louers' transaction was a

foreclosure rescue, and prepared a HUD-1 document which falsely indicated that a $1,000

earnest money deposit had been paid by the buyer and that the buyer provided $64,263.56 at

closing.  There is also evidence that Transcontinental recorded the Deed as an owner-occupied

property even though it knew that the buyer was not going to occupy the property.[10]  Just as the

defendants in *Massey* performed services beyond the scope of their license in violation of

RP § 7-302(a)(6), there is evidence here that, if accepted by the jury, would support a finding

that Transcontinental knowingly filed false documents and thus performed services that went

---

[10]  As previously noted, the preparation and recording of settlement documents was within the scope of Transcontinental's
employees' duties.

beyond the scope of normal settlement services.  Such a finding would support a conclusion that

Transcontinental is not exempt from PHIFA.[11]

### C.   Count III—Unjust Enrichment

"Unjust enrichment consists of three elements: (1) a benefit conferred upon the defendant

by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the

acceptance or retention by the defendant of the benefit under such circumstances as to make it

inequitable for the defendant to retain the benefit without the payment of its value."  *Hill v.

Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007) (citations omitted).  "[A]n unjust

enrichment claim is based on a quasi-contract or an implied-in-law contract" and "is simply a

rule of law that requires restitution to the plaintiff of something that came into defendant's hands

but belongs to the plaintiff in some sense."  *Bank of Am. Corp. v. Gibbons*, 173 Md. App. 261,

271 (2007) (citations and quotation marks omitted).

Here, Transcontinental does not dispute that it received a $300 fee from the Plaintiffs'

transaction.  Rather, it claims that this benefit was conferred pursuant to Plaintiffs' contract with

Shanita Lacy, to which Transcontinental was not a party, and that Transcontinental is not

responsible for Ms. Lacy's failure to perform under that contract.  However, Transcontinental

does not, and cannot, argue that no jury could conclude that Transcontinental implicitly

represented to Plaintiffs that it would prepare proper settlement documents and agreed to do so.

Transcontinental is thus not entitled to summary judgment on this count, although it appears to

be undisputed that restitution is limited to the $300 that Transcontinental received for its

services.  *See Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs,* 155 Md. App.

---

[11] Transcontinental does not challenge the merits of Plaintiffs' PHIFA claim, choosing to argue only the exemption issue in its motion for summary judgment.  Transcontinental may have violated RP § 7-307(1), which prohibits a foreclosure consultant from receiving compensation before the foreclosure services are fully performed; RP § 7-306, which requires a foreclosure consultant to provide a foreclosure consulting contract; and RP § 7-305, which requires a foreclosure consultant to give homeowners notice of their right to rescission of the contract.

415, 455 (2004) (the purpose of a restitution claim "is to prevent the defendant's unjust

enrichment by recapturing the gains the defendant secured in a transaction").

### D.  Count IV—Negligence

The elements of negligence require a plaintiff to show:  "(1) that the defendant was under

a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the

plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from

the defendant's breach of the duty."  *Chi. Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 290 (2006)

(quotations and citations omitted).

In the Amended Complaint, Plaintiffs allege that Transcontinental owed them several

duties, specifically: to ensure that their transaction was legal in accordance with applicable law;

to ensure that their agents were not engaging in fraudulent behavior; to take reasonable steps to

ensure that information contained on the HUD-1 Settlement Statement and other closing

documents was accurate; to ensure that the lender's instructions regarding settlement procedures

were followed; to take all reasonable steps to ensure that the Louers would be able to secure

funding to re-acquire the property; and to abide by all relevant regulations in effect at the time of

the transaction.  However, they cite no authority for imposing any duty on Transcontinental other

than the Federal regulatory duty to accurately prepare HUD-1 settlement documents. While the

court is not inclined to find that a common law tort duty arises from these regulations, the claim

fails in any event because any breach of duty by Transcontinental did not cause Plaintiffs' loss.

"To be a proximate cause for an injury, the negligence must be 1) a cause in fact, and 2)

a legally cognizable cause."  *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 504-05 (2011).

> Causation-in-fact concerns the threshold inquiry of whether a defendant's conduct
> actually produced an injury.  Where it is possible that two or more independent
> negligent acts brought about the injury, we use the substantial factor test.  Under
> this test, causation-in-fact may be found if it is more likely than not that the
> defendant's conduct was a substantial factor in producing the plaintiff's injuries.
>
> Once causation-in-fact is established, the proximate cause inquiry turns to

14

> whether the defendant's negligent actions constitute a legally cognizable cause of
> the complainant's injuries. . . . The question of legal causation most often
> involves a determination of whether the injuries were a foreseeable result of the
> negligent conduct.  Thus, whereas the causation-in-fact analysis is guided by the
> substantial factor test, the legal causation analysis is grounded in foreseeability.

*Id.*  Thus, Plaintiffs must show that Transcontinental's conduct was a substantial factor in producing their injury, and that their injury was a reasonably foreseeable result of Transcontinental's conduct.  The court has already set forth the failure to meet the substantial factor test with regard to Plaintiffs' reliance on Transcontinental's actions in going forward with the transaction.  For the same reasons, Transcontinental's actions did not bring about Plaintiffs' injury.  Moreover, Plaintiffs cannot show that Transcontinental could have foreseen that Shanita Lacy would fail to make the promised payments on the house.

The court also has noted that a person of ordinary prudence in Plaintiffs' position would have read the settlement documents and realized that they contained the very inaccuracies which Plaintiffs now allege create Transcontinental's liability.  If the inaccuracy of these documents is a legally contributing cause to Plaintiffs' injury, then so is Plaintiffs' own negligence in failing to discover the inaccuracy.  Contributory negligence is a complete defense to primary negligence, *Hairston v. Montgomery Co. Bd. Of Educ.,* 295 Md. 442 (1983), and Transcontinental is thus entitled to summary judgment on Count IV.

In conclusion, summary judgment is granted on Counts I and IV and denied on Counts II and III.

Date:  September 20, 2012                         /s/
                                           JILLYN K. SCHULZE
                                           United States Magistrate Judge

15